# JAMES L. MILLER *v.* GERARD E. EGAN ET AL.
## (SC 16730)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

302

Argued January 17—officially released August 12, 2003

*Eliot D. Prescott*, assistant attorney general, with whom were *Gregory T. D'Auria*, associate attorney general, and, on the brief, were *Richard Blumenthal*, attorney general, and *Jane R. Rosenberg*, assistant attorney general, for the appellants (defendants).

*Michael S. Taylor*, with whom were *Wesley W. Horton* and *R. Edward Phillips*, for the appellee (plaintiff).

*Opinion*

BORDEN, J. The defendants, former high sheriff of New London county Gerard E. Egan, former chief deputy sheriff Thomas Connors, former special deputy sheriffs Martin Lane, Daniel Tamborra, Richard Miller, and the state of Connecticut, appeal[1] from the judgment

---

[1] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

of the trial court denying their motion to dismiss the complaint of the plaintiff, James L. Miller, for lack of subject matter jurisdiction.[2] The defendants claim that the trial court improperly concluded, with regard to counts seven and eight of the plaintiff's complaint, that those claims fall under the exception to sovereign immunity for actions by state officers in excess of their statutory authority, and, with regard to counts one through six, nine and ten of the plaintiff's complaint, that the legislature had waived sovereign immunity through General Statutes (Rev. to 1999) § 6-30a,[3] which requires sheriffs to obtain personal liability insurance.[4]

[2] "The general rule is that the denial of a motion to dismiss is an interlocutory ruling and, therefore, is not a final judgment for purposes of appeal." (Internal quotation marks omitted.) *Martinez* v. *Dept. of Public Safety*, 263 Conn. 74, 77 n.5, 818 A.2d 758 (2003). The denial of a motion to dismiss based on a colorable claim of sovereign immunity, by contrast, "is an immediately appealable final judgment because the order or action so concludes the rights of the parties that further proceedings cannot affect them." (Internal quotation marks omitted.) Id.

[3] General Statutes (Rev. to 1999) § 6-30a provides in relevant part: "Each sheriff and deputy sheriff . . . shall be required to carry personal liability insurance for damages caused by reason of his tortious acts in not less than the following amounts: For damages caused to any one person or to the property of any one person, one hundred thousand dollars and for damages caused to more than one person or to the property of more than one person, three hundred thousand dollars. For the purpose of this section 'tortious act' means negligent acts, errors or omissions for which such sheriff or deputy sheriff may become legally obligated to any damages for false arrest, erroneous service of civil papers, false imprisonment, malicious prosecution, libel, slander, defamation of character, violation of property rights or assault and battery if committed while making or attempting to make an arrest or against a person under arrest; provided, it shall not include any such act unless committed in the performance of the official duties of such sheriff or deputy sheriff." Subsequent references to § 6-30a in this opinion are to the 1999 revision of the statute.

[4] The plaintiff also argues, in the alternative, that even if § 6-30a does not operate as a legislative waiver of sovereign immunity, the exception to the sovereign immunity doctrine for actions by state officers in excess of their statutory authority also applies to counts one through six, nine and ten of the plaintiff's complaint, because in those counts he had alleged actions by state officers in excess of their statutory authority. Because we reject the plaintiff's argument that the exception for actions by state officers in excess of statutory authority applies to actions for money damages, it is unnecessary

We agree with the defendants and, accordingly, we reverse the judgment of the trial court.

The plaintiff, a former employee of the New London county sheriff's office, brought this action in ten counts against the individual defendants in their official capacities and the state of Connecticut, based on three incidents that occurred while the plaintiff was working in the New London county sheriff's office. In his complaint, the plaintiff sought compensatory and punitive damages, as well as attorney's fees, and "[s]uch other relief, legal and equitable,[5] as may be proper to the ends of justice." The defendants moved to dismiss the complaint on the ground that the action was barred by the doctrine of sovereign immunity, and, therefore, that the trial court lacked subject matter jurisdiction. The trial court denied the motion to dismiss, concluding that: (1) as to counts seven and eight of the complaint, the plaintiff's claims fell under the exception to the doctrine of sovereign immunity, as applied by this court in *Antinerella* v. *Rioux*, 229 Conn. 479, 642 A.2d 699 (1994), and *Shay* v. *Rossi*, 253 Conn. 134, 749 A.2d 1147 (2000), for actions in excess of statutory authority; and (2) as to counts one through six, nine and ten of the complaint, the legislature had waived immunity for those actions through § 6-30a.[6] This appeal followed.

for us to determine whether counts one through six, nine and ten of the plaintiff's complaint did in fact allege that the defendants had acted in excess of their statutory authority.

[5] Although the plaintiff included unspecified equitable relief, it is clear that his claims are for money damages only. The plaintiff is no longer an employee of the sheriff's office. Instead, because he is currently a judicial marshal, he is an employee of the judicial branch. Therefore, any potential requests for equitable relief could not benefit him. Furthermore, there is no suggestion that the isolated instances of alleged misconduct were part of a practice or policy of the defendants that would justify equitable relief. We construe the plaintiff's complaint, therefore, as limited to claims for money damages.

[6] The defendants then moved for reargument and reconsideration, contending that: (1) because § 6-30a applies only to sheriffs and deputy sheriffs, it did not apply to most of the defendants, who were special deputy sheriffs; and (2) the plaintiff had not alleged that the defendants had acted in excess

As we must in reviewing a motion to dismiss, we "take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Brookridge District Assn.* v. *Planning & Zoning Commission*, 259 Conn. 607, 611, 793 A.2d 215 (2002). In his complaint, the plaintiff alleged the following facts: At the time of the alleged wrongdoing, the plaintiff and all of the individual defendants were members of the New London county sheriff's department (department). The first of the three incidents giving rise to this action occurred in connection with a bomb threat that the department had received in February, 1999. Because the plaintiff believed that the department had violated established safety and security procedures in handling the bomb threat, he wrote a letter to William Novi, the trial court administrator for the judicial district of New London, reporting the alleged violations. At the same time, the plaintiff notified Richard Miller, his supervisor, that he was sending the letter. The plaintiff further alleged that Miller and Lane, acting on orders from Egan, subsequently retaliated against him for writing the letter to Novi. Specifically, the plaintiff alleged that on March 10, 1999, Miller and Lane ordered the plaintiff into a jury deliberation room of the courthouse. Once he was inside the room, they locked the door and handed him a prepared statement, instructing him that he would not be allowed to leave the room until he signed the document. The prepared statement constituted a "confession" that the plaintiff had violated departmental policy by communicating to Novi his concerns regarding the department's performance in

---

of their statutory authority or pursuant to an unconstitutional statute. The court denied the defendants' motion. In this appeal, the defendants again raise the argument that § 6-30a does not apply to most of the defendants. Because, however, we resolve the appeal on other grounds, it is unnecessary for us to reach that issue.

response to the bomb threat, rather than following the established chain of command in the department. After eight minutes, Miller and Lane released the plaintiff.[7]

The plaintiff further alleged that, on two separate occasions, one or more of the defendants made defamatory statements about him to local newspapers. On the first occasion, the plaintiff alleged, Egan had made certain statements to a reporter for The New London Day, a New London county newspaper. The statements, which subsequently were published in the newspaper, claimed that: (1) the plaintiff, or someone close to him, had broken into Egan's office at the New London courthouse, stolen records and tampered with a computer; (2) on several occasions, the plaintiff, or someone acting on his behalf, had vandalized Connors' home; and (3) the plaintiff had arranged for the improper or illegal purchase of guns for the department from a friend who owned Reloads, Inc., in Manchester. Subsequently, the plaintiff alleged, Egan, Connors and Tamborra had made statements that were published in the Norwich Bulletin, another New London county newspaper. In addition to claiming that the plaintiff had been involved in the illegal or improper purchase of guns for the department, these statements alleged that: (1) the plaintiff wrongfully had asked for the department's sales tax exemption number to avoid paying sales and use tax on the gun purchases; and (2) the plaintiff wrongfully had removed documents from Egan's office and had given those documents to the attorney general, who later published a report on the department, referencing the documents.[8]

---

[7] It is unclear from the plaintiff's complaint whether he alleged that he had signed the document. In connection with these allegations, the plaintiff brings the following claims against Egan, Miller and Lane, in their official capacities, and against the state: in counts five and six, false imprisonment; in counts seven and eight, civil conspiracy; and in counts nine and ten, violations of 42 U.S.C. § 1983.

[8] In connection with the plaintiff's allegations regarding both sets of statements made to the newspapers, he brings claims, in counts one through

I

As a preliminary matter, we address the plaintiff's claim that his complaint sued the individually named defendants in their individual capacities, as well as in their official capacities. If the plaintiff's complaint reasonably may be construed to bring claims against the defendants in their individual capacities, then sovereign immunity would not bar those claims.[9] See *Martin* v. *Brady*, 261 Conn. 372, 374, 802 A.2d 814 (2002). The counts that would be affected by this construction of the complaint are those brought against the individual defendants, namely: count one, which alleged a claim for defamation against Egan for the statements he had made to The New London Day; count three, which alleged a claim for defamation against Egan, Connors and Tamborra for statements they had made to the Norwich Bulletin; count five, which alleged a claim for false imprisonment against Egan, Lane and Miller for the actions of Miller and Lane, upon the alleged direction of Egan, in confining the plaintiff in a jury room; count seven, which alleged a claim for civil conspiracy against Egan, Miller and Lane; and count nine, which alleged a claim against Egan, Miller and Lane for violating the plaintiff's civil rights under 42 U.S.C. § 1983.

In support of his claim, the plaintiff points out that the complaint named the individual defendants separately as parties to this action, in addition to the state. The defendants counter that the plaintiff's complaint repeatedly alleged that he was bringing suit against the defendants in their official capacities. Additionally, the defendants point out that the plaintiff *had* to name the

four of the complaint, against Egan, Tamborra and Connors, in their official capacities, and against the state.

[9] The defendants concede this point in their brief. We disagree, however, with the plaintiff's additional contention that, despite the inapplicability of sovereign immunity to an individual capacity suit, the state may be held liable in such an action.

individual defendants separately as parties in order to sue the individual defendants in their official capacities, so the mere fact that he did so does not compel the conclusion that he has sued them in their individual capacities as well. We agree with the defendants.

The construction of a pleading is a question of law, over which we exercise plenary review. See *Home Oil Co.* v. *Todd*, 195 Conn. 333, 340, 487 A.2d 1095 (1985). The determination of whether the plaintiff's complaint alleged claims against the defendants in their individual capacities is governed by the test set forth in *Spring* v. *Constantino*, 168 Conn. 563, 568, 362 A.2d 871 (1975). In *Spring*, the plaintiff brought an action against the individual defendant, a public defender, in his individual capacity. The attorney general appeared on behalf of the defendant and asserted that sovereign immunity barred the action. The court agreed with the attorney general that "[t]he fact that the state is not named as a defendant does not conclusively establish that the action is not within the principle which prohibits actions against the sovereign without its consent. . . . The vital test is to be found in the essential nature and effect of the proceeding." (Internal quotation marks omitted.) Id. The court then set forth four criteria to determine whether an action is "in effect, one against the state and cannot be maintained without its consent: (1) a state official has been sued; (2) the suit concerns some matter in which that official represents the state; (3) the state is the real party against whom relief is sought; and (4) the judgment, though nominally against the official, will operate to control the activities of the state or subject it to liability." (Internal quotation marks omitted.) Id.

The plaintiff concedes that the first two criteria of *Spring* are met. He argues, however, that the third criterion is not met because the complaint sought relief both from the state and from the individual defendants. The

plaintiff's bare assertion, however, is not supported by the allegations of the complaint. Nowhere in the plaintiff's complaint did he allege that he was bringing an action against the defendants in their individual capacities. Instead, as already noted, the complaint repeatedly alleged that the defendants acted in their official capacity. We agree with the defendants that "the right of a plaintiff to recover is limited by the allegations of [his] complaint . . . ." (Internal quotation marks omitted.) *Journal Publishing Co.* v. *Hartford Courant Co.*, 261 Conn. 673, 686, 804 A.2d 823 (2002). We do not countenance "a variance [from the allegations of a complaint] which alters the basic nature of a complainant's cause of action . . . ." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 63, 717 A.2d 77 (1998).

The plaintiff's arguments to the trial court in opposition to the motion to dismiss further support the conclusion that the plaintiff had, until now, sought relief solely from the state. The defendants' motion to dismiss the *entire complaint* was based on the doctrine of sovereign immunity, which they argued deprived the court of subject matter jurisdiction and required the plaintiff to exhaust his administrative remedies by proceeding through the office of the claims commissioner. The plaintiff could have responded, in his objection to the motion to dismiss, that his complaint had brought claims against the individual defendants, not only in their official capacities, but also in their individual capacities, and could have argued that sovereign immunity was inapplicable to any individual capacity claims, but he did not do so. Instead, the plaintiff argued that the legislature had waived sovereign immunity through General Statutes (Rev. to 1999) §§ 6-30 and 6-30a, and that he was not required, pursuant to General Statutes § 4-165, to exhaust his administrative remedies because

he had alleged in the complaint that the defendants' actions were reckless and malicious. The trial court's memorandum of decision specifically referenced the latter argument and concluded that it was inapplicable to the present case because the plaintiff had asserted his claims against the defendants solely in their official capacities and sought relief solely from the state. The plaintiff did not seek clarification or articulation based on the trial court's determination. The defendants, however, moved for reargument and reconsideration. Essential to the defendants' argument in support of their motion was the trial court's determination that the plaintiff's action was brought against the defendants in their official capacities. Again, in his objection to the defendants' motion for reargument, the plaintiff made no claim that he sought also to sue the defendants in their individual capacities. Thus, the plaintiff had multiple opportunities in the trial court to argue that his complaint sought relief from the defendants in their individual capacities, in addition to seeking relief from the state, but he failed to do so.

We decline to permit the plaintiff now, merely by making a conclusory statement that he also sought relief against the individual defendants, to avoid dismissal of the complaint. Otherwise, it would simply be too easy for a plaintiff, who originally had alleged causes of action against a state officer only in his official capacity, thus seeking relief solely against the state, subsequently to claim that he also sought relief against the state officer in his individual capacity. By utilizing this tactic, a plaintiff could, at least partially, avoid dismissal of a complaint due to sovereign immunity and subject the unsuspecting state officer to personal liability.

We discuss count nine of the plaintiff's complaint, which brought an action against Egan, Miller and Lane pursuant to 42 U.S.C. § 1983, in greater detail. Section 1983 of title 42 of the United States Code provides in

relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." A state, as an entity having immunity under the eleventh amendment to the United States constitution, is not a "person" within the meaning of § 1983 and thus is "not subject to suit under § 1983 in either federal court or state court." *Howlett* v. *Rose*, 496 U.S. 356, 365, 110 S. Ct. 2430, 110 L. Ed. 2d 332 (1990). This rule also extends to state officers sued in their official capacities. See *Will* v. *Michigan Dept. of State Police*, 491 U.S. 58, 70–71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Although it would have made sense, given the unavailability of an official capacity claim under § 1983, for the plaintiff to have sued the defendants only in their individual capacities in count nine of the complaint, it is apparent from the plaintiff's allegations that he did not do so. Specifically, count nine alleged that Miller and Lane were acting "as employees and/or *agents of the State of Connecticut*," and that Egan was acting in his official capacity. (Emphasis added.) Furthermore, in count ten of the complaint, the plaintiff expressly seeks relief from the state pursuant to § 1983. We conclude, therefore, that count nine of the plaintiff's complaint sought relief from the state, not from the individual defendants.

Therefore, we conclude that the third criterion of *Spring* is met on all counts of the complaint. Furthermore, because the complaint sought relief solely against the state, the fourth criterion is also satisfied because a judgment against the state would subject it to liability. Thus, we agree with the trial court's determinations

that "[t]he plaintiff has asserted his claims against the defendants solely in their official capacities"; and that all of the counts of the plaintiff's complaint "ultimately seek relief solely from the state."

II

We next consider whether the trial court properly denied the defendants' motion to dismiss as to counts seven and eight of the plaintiff's complaint, on the ground that both of those claims fall under the exception to sovereign immunity for actions by state officers in excess of their statutory authority. The plaintiff alleged, in counts seven and eight,[10] that the actions of Miller and Lane, in confining him in the jury room in retaliation for his letter to Novi, and Egan's authorization of those actions, constituted a civil conspiracy to commit unlawful acts in violation of the plaintiff's rights under the fourth amendment to the United States constitution. Although the plaintiff did not expressly allege in his complaint that the defendants had acted in excess of their statutory authority, the trial court, in denying the defendants' motion to dismiss, concluded that the factual allegations of the complaint, if proven, were "sufficient to establish that the defendants' conduct was sufficiently egregious so as to constitute conduct that was in excess of their statutory authority . . . ."[11] (Citation omitted.) Relying on that determination, and on this court's decisions in *Shay* v. *Rossi*, supra, 253 Conn. 134, and *Antinerella* v. *Rioux*, supra, 229 Conn. 479, the trial court concluded that the plaintiff's claims fell under the exception to the doctrine of sovereign immunity for actions by state officers in excess of their

[10] Count seven of the complaint was brought against Miller, Lane and Egan, in their official capacities, and count eight was brought against the state under the theory of respondeat superior.

[11] We assume, without deciding, that counts seven and eight of the complaint sufficiently alleged that the individual defendants had acted in excess of their statutory authority.

statutory authority. On appeal, the defendants argue that the exception applies only to actions seeking declaratory or injunctive relief, not to actions, such as the plaintiff's, that seek only money damages. See footnote 5 of this opinion. We agree with the defendants.

"[T]he doctrine of sovereign immunity implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss. . . . *Antinerella* v. *Rioux*, [supra, 229 Conn. 489]. A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Martinez* v. *Dept. of Public Safety*, 263 Conn. 74, 80–81, 818 A.2d 758 (2003).

"[W]e have long recognized the validity of the common-law principle that the state cannot be sued without its consent . . . ." *Horton* v. *Meskill*, 172 Conn. 615, 623, 376 A.2d 359 (1977). "We have also recognized that because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state." (Internal quotation marks omitted.) *Fetterman* v. *University of Connecticut*, 192 Conn. 539, 550–51, 473 A.2d 1176 (1984). "While the principle of sovereign immunity is deeply rooted in our common law, it has, nevertheless, been modified and adapted to the American concept of constitutional government where the source of governmental power and authority is not vested by divine right in a ruler but rests in the people themselves who have adopted constitutions creating governments with defined and limited powers and courts to interpret these basic laws. The source of the sovereign power of the state is now the constitution which created it, and it is now recognized that, as Mr.

Justice Holmes wrote: 'A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.' " *Horton* v. *Meskill*, supra, 623.

We have held that a plaintiff seeking to circumvent the doctrine of sovereign immunity must show that: (1) the legislature, either expressly or by force of a necessary implication, statutorily waived the state's sovereign immunity; *Martinez* v. *Dept. of Public Safety*, supra, 263 Conn. 85–86; or (2) in an action for declaratory or injunctive relief, the state officer or officers against whom such relief is sought acted in excess of statutory authority, or pursuant to an unconstitutional statute. *Horton* v. *Meskill*, supra, 172 Conn. 624.

We previously have explained the reasons underlying the exception to the doctrine of sovereign immunity for actions seeking declaratory or injunctive relief against a state officer for conduct in excess of statutory authority. "Sovereign immunity rests on the principle and on the hazard that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property." (Internal quotation marks omitted.) *Pamela B.* v. *Ment*, 244 Conn. 296, 328, 709 A.2d 1089 (1998). Because a court may tailor declaratory and injunctive relief so as to minimize any such interference, and in order "to afford an opportunity for voluntary compliance with the judgment," actions that seek injunctive or declaratory relief against a state officer acting in excess of statutory authority or pursuant to an unconstitutional statute do not conflict with the policies underlying the doctrine of sovereign immunity. *Doe* v. *Heintz*, 204 Conn. 17, 32, 526 A.2d 1318 (1987).

For example, in *Horton* v. *Meskill*, supra, 172 Conn. 628, this court concluded that sovereign immunity did not bar the plaintiffs' claim seeking a declaratory judgment that the system of financing public elementary and secondary education in this state violated the state constitution, where the plaintiffs alleged that governmental officials were acting pursuant to an unconstitutional statute or in excess of their statutory authority in implementing the system. We noted in *Horton* that "we have many times in the past considered the merits of appeals from judgments *in declaratory judgment actions* when state officials have been parties." (Emphasis added.) Id., 625; see also *Savage* v. *Aronson*, 214 Conn. 256, 266, 571 A.2d 696 (1990) (action to enjoin defendant from limiting payment of emergency housing assistance benefits to plaintiffs to 100 days per calendar year not barred by sovereign immunity where plaintiffs alleged breaches of defendant's statutory obligations that resulted in violation of plaintiffs' constitutional rights); *Sentner* v. *Board of Trustees*, 184 Conn. 339, 344, 439 A.2d 1033 (1981) (claim for prospective injunctive relief not barred by sovereign immunity because "trial courts can avoid undue interference with governmental functions by tailoring injunctive relief and scrupulously weighing the equities"); *Weaver* v. *Ives*, 152 Conn. 586, 590–91, 210 A.2d 661 (1965) ("[t]he principle that the sovereign cannot be sued without its consent does not prohibit a suit for injunctive relief against one of its officers who is acting without authority").

This exception does not apply, however, to claims against the state for monetary damages. See *Krozser* v. *New Haven*, 212 Conn. 415, 423, 562 A.2d 1080 (1989) (plaintiff seeking money damages against state, alleging that defendant's actions violated his constitutional rights, required to seek waiver of immunity from claims commissioner before bringing action in court), cert. denied, 493 U.S. 1036, 110 S. Ct. 757, 107 L. Ed. 2d 774

(1990); *Barde* v. *Board of Trustees*, 207 Conn. 59, 60–61, 539 A.2d 1000 (1988) (treating plaintiff's claims for injunctive relief and money damages separately; as to money damages, plaintiff required to exhaust administrative remedies by proceeding through claims commissioner; as to injunctive relief, plaintiff's claims of constitutional violations not sufficiently established); *Doe* v. *Heintz*, supra, 204 Conn. 36–37 (sovereign immunity barred plaintiffs' claims for attorney's fees and costs, despite plaintiffs' allegations that state officer was acting pursuant to unconstitutional statute); *Fetterman* v. *University of Connecticut*, supra, 192 Conn. 553 (treating claims for monetary damages and declaratory relief separately and concluding that counts "requesting relief by way of damages" were barred by doctrine of sovereign immunity).

We explained the reasons underlying this distinction in *Doe* v. *Heintz*, supra, 204 Conn. 31–33, wherein we distinguished the plaintiffs' claims for declaratory and injunctive relief from the claims for attorney's fees and costs. As to the plaintiffs' claims for declaratory and injunctive relief, we stated the familiar rule: "Sovereign immunity does not bar suits against state officials acting in excess of their statutory authority or pursuant to an unconstitutional statute. . . . This court has accordingly entertained suits like the present action, in which declaratory relief is sought as well as related injunctive relief . . . and also suits seeking only to enjoin state officers from illegal or unconstitutional acts. . . . With respect to the declaratory and injunctive relief sought by the plaintiffs and ordered by the court in this case, these precedents plainly establish that sovereign immunity is unavailable as a defense . . . ." (Citations omitted.) Id., 31–32.

As to the plaintiffs' claims for monetary damages, however, we stated: "In the absence of legislative authority . . . we have declined to permit any mone-

tary award against the state or its officials. . . . We have excepted declaratory and injunctive relief from the sovereign immunity doctrine on the ground that a court may fashion these remedies in such a manner as to minimize disruption of government and to afford an opportunity for voluntary compliance with the judgment. . . . A money judgment, however, is directly enforceable, without further court intervention, against any property of the judgment debtor that is not statutorily exempt. . . .

"Even where the monetary award is so minimal as the sum a prevailing party would be entitled to receive as taxable costs under General Statutes § 52-257, this court has refused to sanction a monetary judgment against the state in the absence of explicit statutory authority. . . . Our refusal to permit an award of so trifling a sum as taxable costs against the state on the ground that sovereign immunity foreclosed such an interpretation of the general terms of our taxation of costs statute strongly militates against approval of the much more substantial award of attorneys' fees made in this case." (Citations omitted.) Id., 32–33.

Moreover, in *Krozser* v. *New Haven*, supra, 212 Conn. 421, we explained that a plaintiff who seeks to bring an action for monetary damages against the state must first obtain authorization from the claims commissioner. In holding that the Superior Court does not have the authority to waive sovereign immunity on behalf of the state, we stated: "When sovereign immunity has not been waived, the claims commissioner is authorized by statute to hear monetary claims against the state and determine whether the claimant has a cognizable claim. See General Statutes §§ 4-141 through 4-165b. . . . This legislation expressly bars suits upon claims cognizable by the claims commissioner except as he may authorize, an indication of the legislative determination to preserve sovereign immunity as a defense to mone-

tary claims against the state not sanctioned by the commissioner or other statutory provisions." (Citation omitted; internal quotation marks omitted.) *Krozser* v. *New Haven*, supra, 421.

The legislative history and purpose of chapter 53 of the General Statutes; General Statutes §§ 4-141 through 4-165; entitled "Claims Against the State," as well as the comprehensive nature of the statutory scheme, support our conclusion that, on a claim for money damages, regardless of whether the plaintiffs have alleged that state officers acted in excess of statutory authority, the plaintiffs must seek a waiver from the claims commissioner before bringing an action against the state in the Superior Court. The office of the claims commissioner was created by Public Acts 1959, No. 685. Prior to 1959, a claimant who sought to sue the state for monetary damages, in the absence of a statutory waiver by the state, had but one remedy—namely, to seek relief from the legislature, either in the form of a monetary award or permission to sue the state. See Conn. Joint Standing Committee Hearings, Appropriations, Pt. 3, 1959 Sess., pp. 919–20. In discussing the need for the claims commission, George Oberst, the director of the legislative council, explained that the commission was intended to ease the legislature's burden in handling claims for monetary relief. Id., p. 920 ("[T]raditionally it is the duty of the General Assembly to hear and decide the great variety of demands made upon the State for the payment of money. When claims are few in number and the financial outlay is small, legislative determination can function efficiently. But as the number of claims increases and demands upon the treasury grow in size, the legislative process becomes progressively incapable of handling them efficiently.").

In the same public act, the legislature enacted what is now General Statutes § 4-165, which provides in relevant part: "No state officer or employee shall be person-

ally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment. *Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter. . . .*" (Emphasis added.) In other words, state employees may not be held personally liable for their negligent actions performed within the scope of their employment. This provision of statutory immunity to state employees has a twofold purpose. First, the legislature sought to avoid placing a burden upon state employment.[12] Second, § 4-165 makes clear that the remedy available to plaintiffs who have suffered harm from the negligent actions of a state employee who acted in the scope of his or her employment must bring a claim against the state "under the provisions of this chapter," namely, chapter 53 of the General Statutes, which governs the office of the claims commissioner.

State employees do not, however, have statutory immunity for wanton, reckless or malicious actions, or for actions not performed within the scope of their employment. For those actions, they may be held personally liable, and a plaintiff who has been injured by such actions is free to bring an action against the individual employee.

The procedure for claims that must proceed through the claims commissioner is well delineated. The com-

---

[12] In discussing the claims commission, Oberst explained: "After studying several alternatives, the [c]ouncil recommends that the present tort liability attaching to state employment be extinguished and that any person having a claim against a state employee be directed to present it to the [c]omission as a claim against the state. . . . Since the state is not liable, it is the practice of some persons to sue the employee, hoping to obtain a judgment or a settlement. With the state providing its citizens with a just and equitable means of presenting claims, continuing the liability of state employees appears unnecessary and, in practice, constitutes a burden on state employment." Conn. Joint Standing Committee Hearings, supra, p. 922.

missioner has jurisdiction, pursuant to General Statutes § 4-158 (a), to "approve immediate payment of just claims not exceeding seven thousand five hundred dollars." Any person who has brought a claim for more than $7500 may waive immediate payment and the claims commissioner, pursuant to General Statutes § 4-159, shall submit the claim to the General Assembly with "recommendations . . . for the payment or rejection of amounts exceeding seven thousand five hundred dollars." In addition to granting direct monetary relief, the claims commissioner may "authorize suit against the state on any claim which, in his opinion, presents an issue of law or fact under which the state, were it a private person, could be liable." General Statutes § 4-160 (a).

Even when the claims commissioner authorizes a suit under § 4-160, the state's liability for the actions of its employees does not extend beyond that of a private employer for the actions of its employees. Section 4-160 (c) provides that "[t]he rights and liability of the state in each such action shall be coextensive with and shall equal the rights and liability of private persons in like circumstances." This court has interpreted this provision to "limit the liability of the state to acts of its employees arising out of the employer-employee relationship." *Spring* v. *Constantino*, supra, 168 Conn. 572. The state would not, therefore, be liable for the actions of its employees, when those actions were not within the scope of employment. See *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 500–501, 656 A.2d 1009 (1995) ("[i]n order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business" [internal quotation marks omitted]).

Thus, the comprehensive nature of the statutory scheme, which specifies in detail under what circum-

stances a plaintiff may bring an action against employees individually, as well as when a plaintiff must seek the authorization of the claims commissioner before proceeding against the state, is consistent with the rule we have established through our case law. That rule is that the exception to sovereign immunity for actions in excess of statutory authority or pursuant to an unconstitutional statute, applies only to actions seeking declaratory or injunctive relief, not to those seeking monetary damages.

The plaintiff relies on our decisions in *Shay* v. *Rossi*, supra, 253 Conn. 134, and *Antinerella* v. *Rioux*, supra, 229 Conn. 479, to argue that the doctrine of sovereign immunity does not bar an action for monetary damages when the plaintiff has alleged injury resulting from a state officer's actions in excess of statutory authority. The plaintiff draws this conclusion based on this court's failure in those cases, both of which involved claims for monetary damages against the state, to hold that the claims were barred by the doctrine of sovereign immunity. This court was required, the plaintiff contends, in both *Antinerella* and *Shay*, to determine whether it had subject matter jurisdiction over the plaintiffs' claims for money damages, and the court's failure to conclude that sovereign immunity barred the claims for money damages in those cases undermines the defendants' argument, in the present case, that the exception to the doctrine of sovereign immunity for actions in excess of statutory authority does not apply to claims for money damages. The plaintiff's reliance, as well as that of the trial court in the present case, on *Shay* and *Antinerella*, although understandable, is misplaced.

In *Antinerella* v. *Rioux*, supra, 229 Conn. 480, the plaintiff deputy sheriff and his wife brought an action against the defendant deputy high sheriff, both in his official and individual capacity, seeking damages and

injunctive relief for wrongful termination of the plaintiff's employment. The trial court granted the defendant's motion to dismiss, and this court reversed the judgment of dismissal, concluding that sovereign immunity did not bar the claims against the defendant in his official capacity. Id., 487. We explained that "[i]n those cases in which it is alleged that the defendant officer is proceeding . . . in excess of his statutory authority, the interest in the protection of the plaintiff's right to be free from the consequences of such action outweighs the interest served by the sovereign immunity doctrine. . . . In such instances, the need to protect the government simply does not arise and the government cannot justifiably claim interference with its functions . . . ." (Citations omitted; internal quotation marks omitted.) Id., 488; J. Block, "Suits Against Government Officers and the Sovereign Immunity Doctrine," 59 Harv. L. Rev. 1060, 1080–81 (1946).

We then explained that "[o]ur decision today supports the central statutory purpose of eradicating illegal behavior by people in authority. It also, however, allows persons who have suffered injuries as a result of these illegalities to be made whole. When an elected official acts within the limits of his or her authority, we have little occasion to supervise, review, restrain or punish . . . and no reason to circumvent the doctrine of sovereign immunity. When, however, the state employee acts solely to further his or her own illegal scheme and not to carry out government policy, there is no reason to provide immunity from suit. Termination of his or her employment serves one purpose while *allowing for damages to flow to the injured party* serves another." (Citation omitted; emphasis added.) *Antinerella* v. *Rioux*, supra, 229 Conn. 497. The defendant in *Antinerella* did not raise, and we therefore did not consider, the line of cases limiting the applicable exception to

sovereign immunity to claims for declaratory or injunctive relief.

In *Shay* v. *Rossi*, supra, 253 Conn. 138–39, the plaintiff parents alleged that the defendant officers and employees of the department had acted in excess of their statutory authority in pursuing an unwarranted investigation into possible child neglect and abuse by the plaintiffs. The trial court had denied the defendants' motion to dismiss the plaintiffs' claim for damages against the defendants in their official capacities. Id., 137. This court affirmed the decision of the trial court, concluding that "the facts of this case bring it within the exception to sovereign immunity for conduct by state actors that is in excess of their statutory authority." Id., 168. As in *Antinerella*, the defendants in *Shay* did not raise, and this court did not consider, whether the fact that the plaintiffs sought *monetary damages* precluded the application of the exception to sovereign immunity for conduct in excess of statutory authority.

The plaintiff in the present case did not attempt in his brief to reconcile *Antinerella* and *Shay* with the line of cases following *Doe* v. *Heintz*, supra, 204 Conn. 17, but at oral argument before this court, he suggested two possible interpretations: (1) this court intended in *Shay* and *Antinerella* to overrule implicitly the *Doe* line of cases; or (2) *Shay* and *Antinerella* represent a "new" line of cases. We consider each of these arguments in turn.

The plaintiff's first suggested reading of the effect of *Shay* and *Antinerella*, that we intended to overrule implicitly the *Doe* line of cases, is unpersuasive. In neither of those cases was the *Doe* line of cases brought to this court's attention. The state simply did not argue that the exception to the doctrine of sovereign immunity for actions in excess of statutory authority does not apply to claims for monetary damages. Although we

acknowledge that, because the doctrine of sovereign immunity implicates subject matter jurisdiction, we could and should have raised the issue sua sponte; see *Webster Bank* v. *Zak*, 259 Conn. 766, 774, 792 A.2d 66 (2002); we simply did not do so, out of inadvertence rather than intention.

The plaintiff next argues that *Shay* and *Antinerella* represent a new line of cases, which are reconcilable with the *Doe* line of cases. Specifically, the plaintiff contended at oral argument before this court that the *Doe* line of cases all involved allegations that state officials acted pursuant to an unconstitutional statute, not that they acted in excess of their statutory authority. For three reasons, we find this argument unpersuasive. First, not all of the *Doe* line of cases necessarily involved actions pursuant to an unconstitutional statute. On the contrary, some of those cases involved allegations that a state official violated the plaintiff's constitutional rights. See, e.g., *Krozser* v. *New Haven*, supra, 212 Conn. 419; *Barde* v. *Board of Trustees*, supra, 207 Conn. 60–61. Not every violation of a constitutional right involves action pursuant to an unconstitutional statute. In fact, it is easy to imagine actions that are in excess of statutory authority that may also violate a citizen's constitutional rights. Therefore, these cases are not as readily distinguishable from *Shay* and *Antinerella* as the plaintiff contends. Second, the plaintiff's suggestion, that the doctrine of sovereign immunity bars an action for monetary damages against the state when it is alleged that a state officer acted in excess of statutory authority, but not when it is alleged that a state officer acted pursuant to an unconstitutional statute, makes little sense. Essentially, the plaintiff would have this court limit relief for the greater wrong, but not the lesser wrong. Lastly, even if we were to agree with the plaintiff that there are now two rules, established by separate lines of cases, such an interpretation would be entirely

inconsistent with the statutory scheme set out in chapter 53 of the General Statutes, as discussed earlier in this opinion. Therefore, although it is true that we recognized in *Shay* v. *Rossi,* supra, 253 Conn. 169, that *"Antinerella* v. *Rioux,* supra, 229 Conn. 489, was the first case in which we were called upon actually to apply the doctrine that sovereign immunity 'does not apply to suits against state officials acting in excess of their statutory authority,' " *Antinerella* and *Shay* are nevertheless irreconcilable with *Doe* v. *Heintz,* supra, 204 Conn. 17, *Fetterman* v. *University of Connecticut,* supra, 192 Conn. 539, *Barde* v. *Board of Trustees,* supra, 59, and *Krozser* v. *New Haven,* supra, 415.

"The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *State* v. *Ferguson,* 260 Conn. 339, 367 n.18, 796 A.2d 1118 (2002). We conclude that this is such a case. *Shay* and *Antinerella* are not only irreconcilable with our prior case law, they also are incompatible with the comprehensive statutory scheme and the legislative history and purpose of chapter 53 of the General Statutes. Therefore, we now overrule *Shay* v. *Rossi,* supra, 253 Conn. 134, and *Antinerella* v. *Rioux,* supra, 229 Conn. 479, to the extent that each of those cases holds that sovereign immunity does not bar monetary damages actions against state officials acting in excess of their statutory authority.

In this case, the plaintiff has not received permission from the office of the claims commissioner to bring this action for money damages against the state. Therefore, because the doctrine of sovereign immunity bars such an action, the trial court's judgment denying the defendants' motion to dismiss as to counts seven and eight of the complaint must be reversed.

In light of our decision, we accept the invitation of the attorney general, made at oral argument before this

court in *Prigge* v. *Ragaglia*, 265 Conn. 338, 828 A.2d 542 (2003), decided today, to reexamine the scope of the exception to the doctrine of sovereign immunity for actions in excess of statutory authority that we articulated in *Shay*.[13] In *Shay*, we identified two possible extremes. First, we rejected the defendants' contention that the exception should be understood similarly to judicial immunity, which applies unless "the judicial conduct is so far outside the normal scope of judicial functions that the judge was in effect not acting as a judge." *Shay* v. *Rossi*, supra, 253 Conn. 170. At the other extreme is the view, adhered to by numerous jurisdictions,[14] that the exception applies to any conduct that was unauthorized. See id., 171. In *Shay*, we opted for a case-by-case standard "somewhere between those two poles, namely, at one pole, the standard for abrogation of judicial immunity, and at the other pole, that a process of statutory interpretation yields a conclusion that the state officials acted beyond their authority." Id., 172. The primary reason that we declined to adopt the broader definition of the exception was our concern that if we did so, the "exception to sovereign immunity would . . . swallow the rule"; id., 171; and "the doc-

[13] The present case was argued one week after *Prigge*, which also involves the issue of whether the exception to the doctrine of sovereign immunity for actions in excess of statutory authority applies to actions for money damages. At the beginning of oral argument in this case, the attorney general recognized that the briefs and arguments of the parties in *Prigge* addressed this issue in greater depth, and that two members of the en banc panel in this case, Justices Katz and Zarella, were not members of the panel in *Prigge*. The attorney general therefore referred the additional panel members to the briefs and oral arguments in *Prigge* as to this issue. Accordingly, although the attorney general suggested during oral argument in *Prigge* that we revisit the scope of the exception for actions in excess of statutory authority, we treat the suggestion as though it had been made in the present case as well.

[14] For example, Georgia, Illinois, New Hampshire, North Carolina, South Carolina and Texas have all adopted the rule that "all it takes to trigger the [exception] is to establish, by a process of statutory interpretation, that the defendants' conduct was unauthorized." *Shay* v. *Rossi*, supra, 253 Conn. 171; see id., 171–72 n.22.

trine of sovereign immunity would be too easily over-come. It would mean, for example, that any tort committed by a state official would not be subject to sovereign immunity, because it could hardly be contended that any such official was statutorily authorized to commit a tort." Id., 172.

Because we now recognize that our decisions in *Shay* and *Antinerella* must be overruled, the concerns we expressed in *Shay* no longer exist. That is, because the exception is limited to actions seeking declaratory or injunctive relief, it is sufficiently narrow and there is simply no danger that the exception will swallow the rule. Therefore, we now conclude that when a process of statutory interpretation establishes that the state officials acted beyond their authority, sovereign immunity does not bar an action seeking declaratory or injunctive relief. See *Hunte* v. *Blumenthal*, 238 Conn. 146, 680 A.2d 1231 (1996).

### III

Lastly, we must determine whether the trial court improperly denied the defendants' motion to dismiss counts one through six, nine and ten of the complaint, concluding that the legislature waived sovereign immunity for these claims, by necessary implication, through § 6-30a. The defendants contend that the claims should have been dismissed because § 6-30a does not constitute a waiver of sovereign immunity. We agree with the defendants.

The issue of whether § 6-30a constitutes a waiver of sovereign immunity presents a question of statutory interpretation, over which we have plenary review. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, [231 Conn. 418, 431, 650 A.2d 557 (1994)]. In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied

to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Bender* v. *Bender*, [258 Conn. 733, 741, 785 A.2d 197 (2001)]. Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be the meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003).

It is well established that "statutes in derogation of sovereign immunity should be strictly construed. . . . Where there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in sovereign immunity." (Citations omitted.) *White* v. *Burns*, 213 Conn. 307, 312, 567 A.2d 1195 (1990).

Keeping these rules of construction in mind, we begin our analysis with the language of the statute. General Statutes (Rev. to 1999) § 6-30a provides in relevant part: "Each sheriff and deputy sheriff . . . shall be required to carry *personal liability insurance* for damages caused by reason of his tortious acts in not less than the following amounts: For damages caused to any one person or to the property of any one person, one hundred thousand dollars and for damages caused to more than one person or to the property of more than one person, three hundred thousand dollars. For the purpose of this section 'tortious act' means negligent acts, errors or omissions for which such sheriff or deputy sheriff may become legally obligated to[15] any damages for false arrest, erroneous service of civil papers, false imprisonment, malicious prosecution, libel, slander, defamation of character, violation of property rights or assault and battery if committed while making or attempting to make an arrest or against a person under arrest; provided, it shall not include any such act unless committed in the performance of the official duties of such sheriff or deputy sheriff." (Emphasis added.)

We fail to see how a requirement that sheriffs and deputy sheriffs purchase *personal* liability insurance necessarily implies that the legislature intended to

---

[15] The word "to" in § 6-30a appears to be a typographical error, because the phrase "legally obligated to any damages" simply is not a syntactically correct usage of the preposition "to." Rather, it is more reasonable to infer that the legislature intended § 6-30a to provide "legally obligated *[for]* any damages . . . ." (Emphasis added.)

waive the state's sovereign immunity, either from suit or liability, under § 6-30a. In fact, the opposite inference makes more sense, namely, that the legislature intended the individual sheriffs and deputy sheriffs, rather than the state, to bear liability for the conduct covered by the statute. This conclusion is bolstered by the statute's definition of "tortious acts" as "negligent acts, errors or omissions *for which such sheriff or deputy sheriff may become legally obligated* . . . ." (Emphasis added.) General Statutes (Rev. to 1999) § 6-30a.

The legislative history of the statute could not be more clear on this issue. During the floor discussion of Public Acts 1976, No. 76-15, which eventually became § 6-30a, Representative Richard D. Tulisano, a member of the judiciary committee, which sponsored the legislation, explained the purpose of the act: "We want to make sure that the public is protected from any acts which the sheriff may incur in the event that he does not have personal assets of his own to cover either misservice of process, assault or battery or any other [of] those items listed in the statute." 19 H.R. Proc., Pt. 2, 1976 Sess., p. 494. If the legislature had intended to waive the state's sovereign immunity by enacting Public Act 76-15, it is difficult to see why the personal assets of the individual sheriffs or deputy sheriffs, or, more particularly, the possible lack thereof, would be a matter of concern. Even more persuasive is the subsequent exchange that took place between Representative Tulisano and Representative Gerald F. Stevens. Specifically, Representative Stevens asked whether it was "the intention of this legislation that no state funds be expended for the purchase of such insurance or for reimbursement of sheriffs." Id., p. 495. Representative Tulisano replied: "[I]t is absolutely the intention of this bill to have it be a personal liability of the sheriff *and not the state*." (Emphasis added.) Id. It would be unreasonable, both in light of this clear evidence to the contrary and

our duty to construe statutes strictly in order to effect the least change to sovereign immunity, to interpret the language and history of § 6-30a necessarily to imply a legislative intent to waive sovereign immunity. Therefore, we conclude, based on the statutory language and the legislative history, that the legislature did not intend § 6-30a to constitute such a waiver.

The plaintiff's argument that §§ 6-30a and 4-165, together, by force of a necessary implication, constitute a legislative waiver of sovereign immunity, applicable to the plaintiff's claims, is not persuasive. In his interpretation of § 6-30a, the plaintiff focuses on two aspects of the statute. First, it requires sheriffs to carry personal liability insurance to cover their "tortious acts," which § 6-30a defines generally as "negligent acts, errors or omissions . . . ." Second, the statute limits the required insurance coverage to acts "committed in the performance of the official duties of such sheriff or deputy sheriff." General Statutes (Rev. to 1999) § 6-30a. Consequently, the plaintiff argues, § 6-30a requires sheriffs to purchase personal liability insurance to cover their negligent acts committed in the course of their duties. Sheriffs and deputy sheriffs, however, the plaintiff argues, can never be sued for their negligent acts committed in the course of their duties, because under § 4-165,[16] as state employees, they have statutory immunity for these actions.[17] Therefore, the plaintiff argues, an interpretation of § 6-30a as not constituting a waiver of the state's sovereign immunity would yield the absurd result that sheriffs and deputy sheriffs would be statuto-

---

[16] General Statutes § 4-165 provides in relevant part: "No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment. Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter. . . ."

[17] The state contests the status of deputy sheriffs as state employees for purposes of § 4-165. We need not, however, address this issue.

rily required to purchase insurance to cover actions for which they can never be held liable, rendering the statute a nullity.

The plaintiff's reasoning is flawed. On the one hand, in asserting his reductio ad absurdum, the plaintiff construes § 6-30a to require coverage only for *negligent acts*, thus necessitating coverage precisely where, the plaintiff argues, there can be no liability. On the other hand, in order for any hypothetical waiver of sovereign immunity effected by § 6-30a to apply to the plaintiff's complaint, which alleged only intentional torts, two of which, false imprisonment and defamation, appear as enumerated torts in § 6-30a, he must concede that § 6-30a applies to the enumerated intentional torts. The plaintiff does not resolve this paradox in his reasoning.

Moreover, we disagree with the plaintiff that the statute requires sheriffs and deputy sheriffs to purchase insurance coverage only for negligent acts. Although § 6-30a defines "tortious acts" covered under the statute as "negligent acts, errors or omissions," the statute also specifically enumerates the following covered torts: "false arrest, erroneous service of civil papers, false imprisonment, malicious prosecution, libel, slander, defamation of character, violation of property rights or assault and battery if committed while making or attempting to make an arrest or against a person under arrest . . . ." General Statutes (Rev. to 1999) § 6-30a. Most of the enumerated torts involve intentional conduct, not negligence. There appears, therefore, to be a conflict in § 6-30a between the general definition of tortious acts as "negligent acts, errors or omissions" and the enumeration of specific intentional torts as acts required to be covered by the insurance policies. We ordinarily interpret statutes, however, so that "specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling." (Internal

quotation marks omitted.) *Southern New England Telephone Co.* v. *Dept. of Public Utility Control*, 261 Conn. 1, 23, 803 A.2d 879 (2002). Therefore, we agree with the defendants that the most rational interpretation of the statute is that sheriffs and deputy sheriffs are required to purchase personal liability insurance to cover both their negligent acts for which they can be held liable,[18] as well as the specifically enumerated torts.

Furthermore, if § 6-30a were interpreted to constitute a waiver of sovereign immunity, thus rendering the state liable for the acts covered under the statute, a *personal* liability insurance policy, purchased by the individual sheriffs and deputy sheriffs, would not pay to cover the state's liability. Therefore, the plaintiff's interpretation of the statute would yield the same absurd result to which the plaintiff objects, namely, that § 6-30a would require sheriffs and deputy sheriffs to purchase personal liability insurance policies that would never pay out.[19]

The plaintiff argues in the alternative that § 4-165 alone operates to waive the state's sovereign immunity. We disagree. In enacting § 4-165, the legislature abrogated the previously existing common-law liability of state employees for their negligent acts performed in the course of their duties. See General Statutes § 4-165; Conn. Joint Standing Committee Hearings, supra, p. 922. The plaintiff argues that the legislature's extinguishment of state employee liability necessarily implies a legislative intent that the state concurrently assumed liability for those actions. This argument ignores the statutory scheme of which § 4-165 is a part,

---

[18] One example of such an act is the negligent service of process, for which sheriffs and deputy sheriffs are liable. See General Statutes (Rev. to 1999) § 6-32.

[19] The plaintiff suggests that the defendants' personal liability insurance policies would cover the *state's* liability for the covered actions, but provides no support for this rather astonishing claim.

requiring plaintiffs to proceed through the claims commissioner's office. In the context of this statutory scheme, § 4-165 cannot reasonably be read so as necessarily to imply a legislative intent to waive the state's sovereign immunity.

The plaintiff also argues that "the claims in the instant case were authorized by law prior to the adoption of the Connecticut state constitution in 1818. Pursuant to article first, § 10, of the state constitution, the 'open courts' provision, the framers are presumed to have intended that the courts be open and available for redress of common-law rights existing prior to 1818. See *Daily* v. *New Britain Machine Co.*, 200 Conn. 562, 585 [512 A.2d 893] (1986). Accordingly, this court has stated that the legislature cannot abolish a right of action which existed prior to 1818 without providing a reasonable alternative." The plaintiff further claims that the creation of the office of the claims commissioner does not constitute a reasonable alternative to "the pre-1818 right to sue sheriffs . . . ." The unstated premise of the plaintiff's argument is that prior to 1818, a common-law right of action existed against a sheriff in his *official* capacity, thus subjecting *the state* to liability. The plaintiff, however, cites no authority for this proposition. Thus, the plaintiff has failed to establish the legal premise of his constitutional argument. Therefore, his claim must fail.

The judgment denying the defendants' motion to dismiss is reversed and the case is remanded to the trial court with direction to grant the motion, and to render judgment dismissing the complaint.

In this opinion NORCOTT, KATZ, PALMER and VERTEFEUILLE, Js., concurred.

ZARELLA, J., with whom SULLIVAN, C. J., joins, concurring. I concur in parts I and II of the well reasoned

majority opinion. I also concur in the result reached in part III but disagree with the analysis therein.

Our case law clearly establishes that, in order to demonstrate the inapplicability of the doctrine of sovereign immunity, a plaintiff must establish that the legislature, either expressly or by necessary implication, statutorily waived sovereign immunity. This court has long held that the state "is not to be sued without its consent. Its rights are not to be diminished by statute, unless a clear intention to that effect on the part of the legislature is *disclosed, by the use of express terms or by force of a necessary implication.*" (Emphasis added.) *State* v. *Kilburn*, 81 Conn. 9, 11, 69 A. 1028 (1908); accord *Lacasse* v. *Burns*, 214 Conn. 464, 468, 572 A.2d 357 (1990); *Fidelity Bank* v. *State*, 166 Conn. 251, 253, 348 A.2d 633 (1974); *Baker* v. *Ives*, 162 Conn. 295, 298, 294 A.2d 290 (1972); *Murphy* v. *Ives*, 151 Conn. 259, 262–63, 196 A.2d 596 (1963).

I read these cases to require that the waiver be expressed in the statute or, alternatively, exist by virtue of a necessary implication derived from the language of the statute. If a statute is silent or there is no implication that necessarily must be drawn from the statutory language, there simply is no waiver.

In part III of its opinion, the majority begins by stating: "The issue of whether [General Statutes (Rev. to 1999)] § 6-30a[1] constitutes a waiver of sovereign immunity presents a question of statutory interpretation, over which we have plenary review. The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we

---

[1] All references in this opinion to § 6-30a are to the 1999 revision.

look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule." (Citations omitted; internal quotation marks omitted.) While I continue to maintain my disagreement with this approach to statutory construction, a view I first expressed in my dissenting opinion in *State* v. *Courchesne*, 262 Conn. 537, 599, 816 A.2d 562 (2003) (*Zarella, J.*, dissenting), I find its application in the context of determining whether the legislature has statutorily waived sovereign immunity to be particularly problematic.

The majority first considers the text of § 6-30a, as *Courchesne* requires. I do not disagree with the majority's cogent textual analysis of § 6-30a. The majority concludes this textual analysis by stating: "We fail to see how a requirement that sheriffs and deputy sheriffs purchase *personal* liability insurance necessarily implies that the legislature intended to waive the state's sovereign immunity, either from suit or liability, under § 6-30a. In fact, the opposite inference makes more sense . . . ." (Emphasis in original.) The majority's conclusion is entirely proper in light of this court's well established rule that the statutory waiver of sovereign immunity must be expressed in the statute or implied from the language of the statute.

The majority continues its analysis of § 6-30a in accordance with *Courchesne* by reviewing the legislative history of § 6-30a, the circumstances surrounding its enactment and the legislative policy that it was designed to implement. When a statute does not contain any

language giving rise to a necessary implication of waiver, however, as § 6-30a does not, consideration of extratextual sources either will be a fool's errand leading to material supportive of nonwaiver, or will lead to some evidence of waiver notwithstanding the lack of textual support. In the former instance, nothing is gained. In the latter instance, a review of extratextual sources would allow a court to supplant what it believes the legislature meant to do for what it did not do. If the necessary implication can be supplied by extratextual sources, as the majority suggests, then we have significantly weakened our jurisprudence regarding sovereign immunity.

This court must recognize that the authority to waive sovereign immunity is a power uniquely relegated to the province of the legislature and one that must not be casually usurped by the courts. We previously have stated, in the face of a challenge to the doctrine of sovereign immunity: "[T]he plaintiff seeks to have this court abrogate by judicial decision the long-established principle of sovereign immunity. This we decline to do. We affirm what this court said in *Bergner* v. *State*, 144 Conn. 282, [286–87], 130 A.2d 293 [1957]: 'The question whether the principles of governmental immunity from suit and liability can best serve this and succeeding generations has become, by force of the long and firm establishment of these principles as precedent, a matter for legislative, not judicial, determination.' " *Fidelity Bank* v. *State*, supra, 166 Conn. 255. The same recognition that we have accorded the legislative branch in protecting its prerogative to effect or not to effect a wholesale abandonment of the doctrine should also be accorded in the context of reviewing particular statutes. If the waiver is neither expressly contained in the statute nor a necessary implication derived from the text of the statute, then there is no waiver, regardless of the existence of anything to the contrary in extratextual

sources. It is the expression of intent *disclosed* in the language of the statute itself that reflects the will of the legislature, as a body, to waive sovereign immunity. See, e.g., *State* v. *Kilburn*, supra, 81 Conn. 11.